## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

SANDRA SCHROEDER                          CASE NO. 20-CV-10914

     *Plaintiff*,                          HON. THOMAS L. LUDINGTON
*v.*                                      DISTRICT JUDGE

COMMISSIONER OF                           HON. PATRICIA T. MORRIS
SOCIAL SECURITY,                          MAGISTRATE JUDGE

     *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 13, 17)

### I.    RECOMMENDATION

Plaintiff Sandra Schroeder challenges Defendant Andrew Saul, acting as the Commissioner of Social Security, regarding a final decision denying her claim for Title II Disability Insurance Benefits ("DIB"). The case was referred to the undersigned for review. (ECF No. 3); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I recommend **DENYING** Plaintiff's motion for summary judgment, (ECF No. 13), **GRANTING** the Commissioner's motion, (ECF No. 17), and affirming the decision.

II.    **REPORT**

### A. Introduction and Procedural History

Plaintiff's application for DIB was completed on September 23, 2017. (ECF No. 10, PageID.202.) She alleged she became disabled on May 30, 2017. (*Id*.) The Commissioner denied the claim on December 26, 2017. (*Id*. at PageID.136.) Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which occurred on November 5, 2018. (*Id*. at PageID.146; *id*. at PageID.77.) The ALJ issued a decision on February 27, 2019, finding that Plaintiff was not disabled. (*Id*. at PageID.63.) The Appeals Council denied review on March 3, 2020. (*Id*. at PageID.35.) Plaintiff sought judicial review on April 9, 2020. (ECF No. 1.) The parties filed cross-motions for summary judgment and briefing is complete. (ECF Nos. 13, 17.)

### B. Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286. (internal citations omitted).

## C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our

listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or] her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 10, PageID.52-63.) At step one, the ALJ found Plaintiff met the insured status requirements through September 30, 2021 and had not engaged in substantial gainful activity since the alleged onset date of May 30, 2017. (*Id.* at PageID.52.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: degenerative disc disease, fibromyalgia, inflammatory arthritis, mild carpal tunnel syndrome of the right upper extremity, dysthymic disorder, generalized anxiety disorder, binge eating disorder, and obesity. (*Id.* at PageID.52-53.) These impairments did not meet or medically equal a listed impairment at step three. (*Id.* at PageID.53.) Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC"):

> to perform sedentary work as defined in 20 CFR 404.1567(a) except that the claimant can occasionally climb ramps and stairs; never climb ladders or scaffolds; occasionally balance, stoop, kneel, and crouch; never crawl; and frequently handle and finger. The claimant must avoid even moderate exposure to extreme cold work environments; concentrated exposure to extreme humidity, wetness, and vibration; and all exposure to workplace hazards such as unprotected heights and hazardous machinery. The work should be limited to simple, repetitive unskilled tasks at SVP 1 or 2 as defined in the Dictionary of Occupational Titles, free of fast-paced production requirements, and few, if any, workplace changes.

(*Id.* at PageID.55-56.) At step four, the ALJ found that Plaintiff was not able to perform any past relevant work. (*Id.* at PageID.61.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy, including, for example, office clerk, reception and information clerk, and bookkeeping, accounting,

and auditing clerk jobs. (*Id.* at PageID.62.) Accordingly, the ALJ concluded that Plaintiff

was not disabled. (*Id.* at PageID.63.)

### E. Administrative Record

#### i. Plaintiff's Testimony at the Administrative Hearing

At the time of the hearing, Plaintiff was 5"2' tall, weighed 200 pounds, was right-

handed, married, and lived with her husband and two children, who were 22 and 20 years

old. (*Id.* at PageID.83-84.) Plaintiff does not personally have any source of income and

relies on her husband. (*Id.* at PageID.84.) Plaintiff has a driver's license and drives

approximately four days out of the week, but only drives short distances. (*Id.* at PageID.84-

85.) Plaintiff has a high school diploma and is able to read and write; she is also licensed

as a notary public. (*Id.* at PageID.85.)

Since the alleged onset date of her disability, Plaintiff worked only as a self-

employed notary public, earning less than $1,000 per month. (*Id.* at PageID.85-86.) Prior

to that, she worked for A.J. Johnson Construction as an "administrator assistant" from the

spring of 2016 until May of 2017. (*Id.* at PageID.86.) She eventually left that job after

having to "call in quite a few times" and having "a hard time focusing and learning," which

Plaintiff attributed to her medical conditions. (*Id.*) In that job, she would sometimes have

to lift objects, but could not lift more than five pounds. (*Id.*) Her general responsibilities in

that role included answering phones, setting appointments, "having to deal with different

websites," service calls, scanning, computer input, and generally acting as the "office

manager." (*Id.* at PageID.87.)  Prior to that job, she worked as an office assistant for

Security First Benefits. (*Id.*)  In that role, her responsibilities included scheduling

appointments, calling insurance companies, and to generally "be an assistant" to the "main insurance agent." (*Id*.) And prior to that job, Plaintiff testified that she worked as an information specialist for medical records at Health Port, where she spent "a fair amount of [] time [] standing as well as sitting." (*Id*. at PageID.88-89.) Some of the charts she had to lift in that role were heavy, but never more than 20 pounds. (*Id*. at PageID.89.)

The ALJ asked Plaintiff about her conditions and her doctors. Plaintiff testified that she sees her rheumatologist, Dr. Trudell, about "once every six months, to maybe once a year." (*Id*. at PageID.90.) The ALJ asked, about Dr. Trudell, "her role primarily is to monitor you, to see how you're doing on the medications. Is everything okay?" Plaintiff responded, "yes." The ALJ followed up, "How frequently are you having flareups? Should there be an adjustment, that kind of thing?" Plaintiff responded again, "yes." (*Id*. at PageID.90.) Plaintiff also sees her primary care doctor, Dr. Foreback, about once a month. (*Id*. at PageID.91.) She was not seeing any pain specialists at that time. (*Id*.) She saw Dr. Kashlan once a week for one-on-one therapy to address her "mental health, for stress and depression." (*Id*.)

The ALJ asked Plaintiff about her medications. She reported that she was taking Hydrocodone, Diazepam, Valium, Plaquenil, Pantoprazole, Ibuprofen, Tylenol, and Lunesta. (*Id*. at PageID.91-92.) She complained of stomach pain due to the Plaquenil and a "spacey" feeling from the Lunesta, although she wasn't sure whether that feeling was actually caused by her depression. (*Id*. at PageID.92.) The Lunesta did help her sleep, but she testified that she was not seeing a benefit from taking the Plaquenil. (*Id*. at PageID.92-93.) When asked, "[i]n terms of the frequency and the severity of the outbreaks or the flare-

7

ups, has anything they've done for you helped?" Plaintiff responded, "no." (*Id*. at PageID.93.)

In the last two years, Plaintiff went to the emergency room two times due to a flare-up, "which caused tendonitis in my arm." (*Id*. at PageID.93-94.) Plaintiff testified that she has carap tunnel syndrome in, at least, her right wrist, and "it hurts all the time." (*Id*. at PageID.94-95.) She does not use a brace, a cane, or any other assistive device to walk. (*Id*. at PageID.95.) She testified that she tried physical therapy, but did not find it particularly helpful, and sometimes made the pain or symptoms worse. (*Id*.) She had cortisone shots for her hip but did not find those to help. (*Id*. at PageID.96.) Toradol helped her in the past but did not help her any longer. (*Id*.)

Then, the ALJ inquired about Plaintiff's primary areas of severe pain that "really is what's stopping [her] from being able to function." (*Id*. at PageID.98.) Plaintiff responded that included her neck, left shoulder, hip, spine, right foot, and right hand. (*Id*.) The ALJ asked how frequently Plaintiff had flare-ups. (*Id*.) Plaintiff responded, "they're starting to happen every two months, definitely every season change." (*Id*. at PageID.99.) Plaintiff reported that a flare would typically last for two months. (*Id*.) The ALJ asked about Plaintiff's flareups, "in terms of your typical ability to function when you have a flare," and Plaintiff responded, "I exist. That's—I can't do anything, other than I am in a recliner, and I have to rely on my family." (*Id*. at PageID.100.) Plaintiff testified that during a flareup, she could sit in a chair for about a 30 to 45 minutes and could stand for about 10 minutes. (*Id*. at PageID.101-02.) She did not walk during a flareup and described her pace during a flare as "very slow." (*Id*. at PageID.102.) Her inflammatory arthritis could cause

a flareup anywhere and did not always occur in the same spot. (*Id*. at PageID.103-104.) If she was experiencing a flareup in her hands, she needs help getting dressed and using buttons and zippers. (*Id*. at PageID.104.) She cannot reach overhead when her hand or shoulder has a flareup. (*Id*.) During a flareup, she cannot cook, vacuum, cut the grass, shovel snow, do laundry, or go grocery shopping. (*Id*.) When she is not experiencing a flareup, Plaintiff is able to perform those listed activities normally, but has trouble going up and down stairs. (*Id*. at PageID.104-05.) During a flareup, she also has trouble with focus and concentration due to the significant pain. (*Id*. at PageID.105-06.)

## ii.     The Vocational Expert's ("VE") Testimony at the Administrative Hearing

The ALJ questioned the vocational expert (VE). (*Id*. at PageID.110.) First, the ALJ asked about Plaintiff's work within the last 15 years. The VE testified that Plaintiff's past work included an "administrative assistant position," SVP 7, skilled work, sedentary exertion level with some acquired skills; an "office assistant position," SVP 4, light work performed as sedentary with some acquired skills; and "medical records clerk," SVP 4, light work performed as light, semi-skilled, with some acquired skills. (*Id*. at PageID.111-12.) The ALJ then asked the VE to consider a hypothetical individual of Plaintiff's age and education who was capable of light work and could:

> Occasionally climb ramps and stairs, never ladders or scaffolds. Occasionally balance, stoop, kneel, crouch, no crawling. Our worker can frequently handle and finger. Our worker must avoid even moderate exposure to extreme cold work environments. Avoid even moderate exposure to humidity and wetness. [] I'm going to change that to avoid concentrated exposure to extreme humidity and wetness. [] Avoid concentrated exposure to vibration and avoid exposure to workplace hazards, such as unprotected heights and hazardous

> machinery. Now the work should be limited to simple, repetitive, unskilled
> tasks at SVP-1 or 2, as defined in the Dictionary of Occupational Titles. The
> work should be free of fast-paced production requirements, and there should
> be few, if any, workplace changes.

(*Id.* at PageID.112-13.) The ALJ asked whether such an individual could perform Plaintiff's past work, and the VE testified "no." (*Id.* at PageID.113.) The VE testified that there would be other jobs available in the national economy, thought; for example, "a reduced range of unskilled office clerk positions," DOT code 222.687-022, SVP 2, 80,000 jobs; "a reduced range of reception and information clerk positions," DOT code 237.367-018, SVP 2, 60,000 jobs; and a reduced range of "office administrative support workers," DOT code 239.567-010, SVP 2, 25,000 jobs. (*Id.*)

The ALJ asked the VE to consider an individual who had the aforementioned limitations, but instead, could only work a sedentary position. (*Id.*) The VE responded "yes"; such jobs included office clerk, DOT code 205.367-014, SVP 2, 50,000 jobs; information clerk, DOT code 237.367-014, SVP 2, 60,000 jobs; and bookkeeping, accounting, and auditing clerk, DOT code 205.367-014, SVP 2, 30,000 jobs. (*Id.* at PageID.114.)

The ALJ asked about the same individual as before, with the same limitations "from the prior hypothetical," but who also had reduced handling and fingering with the right upper extremity to occasional use. (*Id.*) The VE testified that there would be 20,000 reception and information clerk jobs, 10,000 office clerk jobs, and 7,500 protective service worker jobs, which is an SVP 2, DOT code 205.367-030. (*Id.*)

Then the ALJ added a restriction that the individual must have a sit/stand option, defined as "must be work to be done in both sitting and standing positions, such that the change of position will not cause the worker to go off task." (*Id.* at PageID.115.) "After sitting for 30 minutes, should have the option to stand for [] 10 minutes. After standing for 10 minutes, should have the option to sit for up to 30." (*Id.*) The VE responded that there would be 5,000 office clerk jobs, 7,500 reception and information clerk jobs, and 5,000 protective service worker jobs. (*Id.*)

The ALJ asked whether missing three days of work per month would preclude this individual from full-time, competitive employment. (*Id.* at PaeID.115-16.) The VE said that it would. (*Id.* at PageID.116.) The VE stated that factors such as percentage off-task, absenteeism, sit/stand options, and the distinction of handling and fingering with one hand were distinction made based on her professional experience placing people in jobs. (*Id.*) She then testified that the remainder of her testimony was consistent with the DOT. (*Id.*)

**F.  Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)     Licensed physician (medical or osteopathic doctor);

(2)     Licensed Psychologist, which includes:

(i)     A licensed or certified psychologist at the independent practice level; or

(ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)     Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)     Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)     Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)     Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)     Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)     Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school

psychologist and acting within the scope of practice permitted under State or Federal law." *Id.*, § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.*, § 404.1502(e). "This includes, but is not limited to: (1) You; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.*, § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(1).

13

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.*, § 404.1520c(c)(3). This factor will include the analysis of:

(i) Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii) Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii) Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v) Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area

of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.*, § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.*, § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.*, § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single

analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.*, § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.*, § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.*, § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.*, § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)    Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)    Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)    Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.*, § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about

whether you are disabled or blind under our rules." *Id.*, § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.*, § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*, § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.*, § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms

can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.*, § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.*, § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.*, § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will

carefully consider any other information you may submit about your symptoms." This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*, § 404.1529(c)(3).

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account…We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

> (i)     [D]aily activities;
>
> (ii)    The location, duration, frequency, and intensity of . . . pain;
>
> (iii)   Precipitating and aggravating factors;
>
> (iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
>
> (v)     Treatment, other than medication, . . . received for relief of . . . pain;
>
> (vi)    Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.*, § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.*, § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)     The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)     The treatment involves amputation of an extremity, or major part of an extremity.

*Id.*, § 404.1530(c).

**G. Arguments and Analysis**

**i.     The RFC**

Plaintiff first argues that the ALJ failed to create an accurate RFC that was supported by substantial evidence because the RFC did not include "the entirety of Plaintiff's limitations." (ECF No. 13, PageID.513.) Specifically, Plaintiff argues that the ALJ failed to include limitations from Plaintiff's "degenerative disc disease, fibromyalgia,

inflammatory arthritis, carpal tunnel syndrome, dysthymic disorder, generalized anxiety disorder, binge eating disorder, obesity, and her palindromic rheumatism which is somehow never even mentioned in the decision as a severe nor non-severe impairment despite substantial evidence proving it to be a severe impairment." (*Id.* at PageID.513-14.)

In contrast, Defendant argues that the ALJ considered the record as a whole and reasonably concluded that Plaintiff had the RFC to perform sedentary work; Defendant specifies, "the issue before this court is whether the ALJ's findings were supported by substantial evidence, not whether there was evidence on which the ALJ could have based more restrictive findings." (ECF No. 17, PageID.539-540.)

In his written decision, the ALJ found that Plaintiff had the RFC to perform:

sedentary work as defined in 20 CFR 404.1567(a) except that the claimant can occasionally climb ramps and stairs; never climb ladders or scaffolds; occasionally balance, stoop, kneel, and crouch; never crawl; and frequently handle and finger. The claimant must avoid even moderate exposure to extreme cold work environments; concentrated exposure to extreme humidity, wetness, and vibration; and all exposure to workplace hazards such as unprotected heights and hazardous machinery. The work should be limited to simple, repetitive unskilled tasks at SVP 1 or 2 as defined in the Dictionary of Occupational Titles, free of fast-paced production requirements, and few, if any, workplace changes.

(ECF No. 10, PageID.55-56.) Prior to this finding, the ALJ acknowledged that Plaintiff's severe impairments included: degenerative disc disease, fibromyalgia, inflammatory arthritis, mild carpal tunnel syndrome of the right upper extremity, dysthymic disorder, generalized anxiety disorder, binge eating disorder, and obesity. (*Id.* at PageID.53.) In making his finding, the ALJ relied on the medical evidence in the record and on Plaintiff's testimony at the hearing, writing "the claimant herself testified that she has a valid driver's

license, is able to drive, and does in fact drive four days a week." The ALJ wrote, "she does not see a pain specialist, has not tried a TENS unit, and has not had surgery for her problems." Further, "the claimant also testified that she does not have any breathing problems, is able to sit for thirty to forty-five minutes, can do household chores such as vacuuming, and sometimes still performs work as a notary." (ECF No. 10, PageID.56.)

The ALJ pointed to evidence in the record, noting abnormal findings of her EMG and nerve conduction performed on Plaintiff's right upper extremity (*Id*. at PageID.58, citing Exhibit 1F/1); mild degenerative changes to Plaintiff's acromioclavicular joint and cervical spine (*Id*., citing Exhibit 2F/1, 3); a diagnosis of generalized anxiety disorder and dysthymic disorder in reports from her psychotherapy services (*Id*., citing Exhibit 3F/1-5); and treatment notes from several doctors from April through September of 2018. (*Id*. at PageID.58-59, citing Exhibits 10F, 7F, 9F.) The ALJ concluded that "the severity alleged (i.e., total disability), is not supported by the record as a whole"; specifically, the ALJ pointed to EMG results showing her carpal tunnel as only mild, CT results showing only mild degenerative disease of the cervical spine, x-rays showing only mild degenerative disc disease of the left shoulder. (*Id*. at PageID.59.) Additionally, the ALJ noted, "[t]he record reveals that the claimant stopped working because her job was eliminated in May 2017, not because she was unable to perform the work." (*Id*.) Indeed, in progress notes from Hillside Center for Behavioral Sciences, where Plaintiff received psychotherapy services, Plaintiff reported that "she lost her job [] as a transcriptionist and medical records department clerk when the computer system [] became the electronic medical record

system and the patient medical records department was reduced by 90 percent." (*Id.* at PageID.58.)

The ALJ also relied on medical reports provided in this case. Based on the state agency medical consultant's opinion, who diagnosed Plaintiff with inflammatory arthritis yet "indicated that she retains the capacity for a restricted range of light work with postural limitations[,]" the ALJ commented, "[c]learly, the claimant's symptoms fluctuate, and there are times when she would be limited to sedentary exertional work. The claimant herself was in fact performing work that was sedentary exertionally[.] Even at that time, the claimant indicated that she was ready, willing, and able to work (and was actively engaged in looking for work) when she filed for unemployment insurance benefits. Therefore, the record certainly supports the ability to perform a range of sedentary work." (*Id.* at PageID.59.) In addition, the ALJ noted that the doctor from Hillside Center for Behavioral Sciences indicated Plaintiff had only "moderate" functional limitations (*Id.*, citing Exhibit 3F/4); Dr. Kachman assessed Plaintiff as having only moderate limitations (*Id.* at PageID.60, citing Exhibit 8F); and Dr. Balunas, a state agency psychological consultant, noted Plaintiff had only moderate limitations. (*Id.*, citing Exhibit 2A/6-7.)

Based on that above evidence, the ALJ concluded that Plaintiff has the RFC to perform sedentary work and included several postural limitations. (*Id.* at PageID.61.)

Plaintiff advances two main arguments in opposition to the RFC: Plaintiff first argues that the ALJ erred by failing to specifically mention by name Plaintiff's palindromic rheumatism or incorporating it into her RFC determination. (ECF No. 13, PageID.513-14.) Plaintiff also takes issue with the ALJ's finding that Dr. Foreback's opinion was not

persuasive. (*Id.*) Specifically, the ALJ found that Dr. Foreback's opinion was not specific enough; Plaintiff argues that "while Dr. Foreback does not specify exactly how long the Plaintiff can sit or stand for at [sic] one time, [. . .] he does indicate – and in more than one part of the record – that Plaintiff experiences flare ups, on average, 'about once a month which can last for days to a month.'" (*Id.* at PageID.515, citing ECF No. 10, PageID.385.)

First, to the extent that the ALJ does not use the term "palindromic rheumatism," I conclude that this error does not require reversal or remand and was ultimately harmless because the ALJ properly considered the whole of Plaintiff's "inflammatory arthritis." As Defendant points out, palindromic rheumatism appears to be a form, or subcategory, of inflammatory arthritis—indeed, the Arthritis Foundation defines it as: "[p]alindromic rheumatism (PR) is a rare type of inflammatory arthritis." *See* Arthritis Foundation, *https://www.arthritis.org/diseases/palindromic-rheumatism* (last visited April 14, 2021); (ECF No. 17, PageID.541.) In fact, Plaintiff relies on the same definition of palindromic rheumatism from this same exact webpage, but omits the sentence describing it as a "rare type of inflammatory arthritis" in her argument. (ECF No. 18, PageID.564, quoting *https://www.arthritis.org/diseases/palindromic-rheumatism*.) This suggests that palindromic rheumatism is considered a type of inflammatory arthritis, which the ALJ referred to numerous times. Further, Defendant note instances in the record where doctors refer to her palindromic rheumatism as inflammatory arthritis, including state agency medical consultant Dr. Dunker (*Id.* at PageID.126-131, noting palindromic rheumatism but listing inflammatory arthritis as a severe impairment); and even Plaintiff's attorney, who acknowledged Plaintiff's impairment as a type of inflammatory arthritis at the hearing. (*Id.*

at PageID.81-82: "[t]he [c]laimant's been diagnosed with palindromic rheumatism, which is a [rare] type of inflammatory arthritis.") Therefore, I suggest that this argument has no merit and the ALJ did not err in failing to name Plaintiff's impairment, specifically, by palindromic rheumatism.

In further support of her position, Plaintiff argues that the ALJ erred by finding Dr. Foreback's opinion unpersuasive. (ECF No. 10, PageID.60.) As previously noted, Plaintiff takes issue with the ALJ's conclusion that Dr. Foreback's opinion was unpersuasive because it did not provide specific limitations. (ECF No. 13, PageID.515, 517.) Plaintiff contends that Dr. Foreback's opinion is "well-supported by the medical records which confirm routine complaints of chronic pain, swelling, and stiffness in the hip, right foot, throughout the spine, bilateral knees, neck, bilateral shoulders, and bilateral hands/wrists." (*Id.* at PageID.517, citing ECF No. 10, PageID.346, 366, 375, 385, 459, 469, 490.) Plaintiff argues that the ALJ should have deferred to Dr. Foreback's opinion regarding the intensity and frequency of Plaintiff's "bad days." (*Id.* at PageID.518-19.)

Defendant argues, "[t]he ALJ first noted that Dr. Foreback's opinion did not provide specific limitations—it was general in nature and did not provide any vocationally relevant restrictions." (ECF No. 17, PageID.548, citing ECF No. 10, PageID.60; *Acosta v. Comm'r of Soc. Sec.*, No. 17-12414, 2018 WL 7254256, at *10 (E.D. Mich. Sept. 6, 2018) (finding that a doctor's opinion was too vague where the opinions did not translate into functional limitations), adopted by 2019 WL 275931 (E.D. Mich. Jan. 22, 2019)). Defendant further argues, "even if this were a case where the doctor's statements were not vague and specifically detailed how many times Plaintiff would miss work or be off-task, many courts

in this Circuit hold that a medical source's estimates on absenteeism and the need for unplanned work breaks are not medical opinions entitled to deference, even when made by treating physicians." (*Id*., citing *Swanson v. Comm'r of Soc. Sec*., No. 18-13564, 2020 WL 1818435, at *11 (E.D. Mich. Jan. 6, 2020), adopted by 2020 WL 1283789 (E.D. Mich. Mar. 18, 2020)). Finally, Defendant avers that the ALJ's decision finding Dr. Foreback's opinion unpersuasive is supported by the record because "the opinion appears to be largely formulated based on Plaintiff's HPI (History of Present Illness) portion of her February 2018 examination, and not based on any examination findings[.]" (*Id*.)

Plaintiff refers to what she argues is a "detailed medical source statement." (ECF No. 13, PageID.514.) This document, to which Plaintiff refers, reads in full:

> Patient is being followed by Rheumatologist and has a rheumatologic condition which impairs her daily-function, including the ability to stand or sit for prolonged periods, ability to sleep and the ability to concentrate. She as chronic, daily pain in her joints. When her condition flares, which happens about once a month and lasts for days to a month, she requires assistance with dressing herself and basic self care.

(ECF No. 10, PageID.385.) Defendant cites a plethora of statutory and case law outlining the general principle that objective medical findings make an opinion more relevant and, thus, more persuasive: 20 C.F.R. 404.1520c(1) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s), the more persuasive the medical opinions . . . will be."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) (finding "treating physician [opinion] was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data."); *McCready v. Comm'r of Soc. Sec.*, No.

10-13893, 2012 WL 1060088, at *8 (E.D. Mich. Mar. 2, 2012) (observations in "history of present illness" section "are merely the narrative description of plaintiff's subjective complaints and symptoms and are not opinions regarding plaintiff's limitations or restrictions"). I find Defendant's position to be persuasive. In conjunction with the analysis conducted by the ALJ of the other medical opinions, and the medical record as a whole, I suggest that the ALJ did not err by declining to rely on Dr. Foreback's opinion, which failed to specify the length of time Plaintiff could stand or sit or any other specific limitations Plaintiff may have.

If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citation omitted). I suggest that Plaintiff's argument on this point also fails.

### ii.   ALJ's Evaluation of Plaintiff's Subjective Complaints

Second, Plaintiff argues that the ALJ's evaluation of Plaintiff's subjective complaints was not supported by substantial evidence. (ECF No. 13, PageID.519-20.) Plaintiff argues, specifically, that the ALJ improperly evaluated the intensity, persistence, and limiting effects of Plaintiff's physical and mental symptoms. (*Id.* at PageID.522.) Plaintiff alleges that the ALJ "downplayed" the severity of her symptoms and "seems to use the fact that the Plaintiff does not treat with a pain specialist, doesn't use a TENS unit, and has not had surgery, against her[.]" (*Id.* at PageID.522-23.) Plaintiff finally avers that

the ALJ disregarded the side effects Plaintiff testified to regarding the various medications she took. (*Id*. at PageID.524.)

The ALJ found that "it is reasonable to find the claimant has limitations in functioning resulting from her impairments," but ultimately found that they could be adequately accommodated. (ECF No. 10, PageID.56.) The ALJ referred to Plaintiff's testimony and Function Report regarding her daily activities; she has a driver's license and drives four days a week, is a notary public, does not see a pain specialist, has not had surgery, does not have breathing problems, can sit for thirty to forty-five minutes, can do household chores such as vacuuming, and sometimes performs work as a notary. (*Id*.) The ALJ further noted that, in her Function Report, Plaintiff reported difficulty getting out of bed, tending to her basic needs, walking, bending, kneeling, and sitting; she typically spent an average day simply watching TV or going to her appointments as needed. (*Id*. at PageID.56-57.) She was able to prepare frozen dinners for herself and perform light household duties, shop in stores for groceries, and could walk for about five to ten minutes. (*Id*. at PageID.57.) She reported that she had difficulty concentrating and got along "good" with authority figures. (*Id*.) The ALJ referred to Plaintiff's hearing testimony, in which she reported difficulty focusing, pain in her neck, shoulders, hip, spine, right foot, and hand, the use of a brace when her hand was in pain, but not on her right wrist; she testified that physical therapy did not help her and Toradol shots have not helped her. (*Id*.) The ALJ then compared these subjective symptoms with the findings of the medical record, which contained opinions from several professionals who determined she had moderate impairments and could perform light work. (*Id*. at PageID.59.)

The ALJ thoroughly analyzed the various factors required concerning subjective complaints in accordance with § 404.1529(c)(3):

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

As outlined above the ALJ properly and thoroughly considered Plaintiff's daily activities, the location, duration, frequency, and intensity of her pain, and the types of medications and treatments she tried and their effectiveness. In addition, it was proper for the ALJ to consider that Plaintiff has only undergone conservative treatment; the treatment Plaintiff received was less than surgery and is considered conservative. *Stewart v. Comm'r of Soc. Sec.*, 811 F. App'x 349, 353 (6th Cir. 2020); *Brannon v. Comm'r of Soc. Sec.*, 539 F. App'x 675, 678 (6th Cir. 2013 ("conservative treatment approach suggests the absence of a disabling condition"); *McKenzie v. Comm'r of Soc. Sec.*, 2000 WL 687680, at *4 (6th Cir. May 19, 2000 ("Plaintiff's complaints of disabling pain are undermined by his non-aggressive treatment."). And the ALJ properly considered the record evidence regarding Plaintiff's activities of daily living. 20 C.F.R. § 404.1529(c)(3)(i); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004).

The SSA has clarified, "statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." § 404.1529(a). I suggest that the ALJ properly considered the various factors required to analyze Plaintiff's subjective complaints and, in conjunction with the available medical evidence, did not err in his analysis and conclusion regarding Plaintiff's subjective complaints. I suggest that Plaintiff's argument here fails, as well.

### H. Conclusion

For these reasons, I suggest that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's motion, (ECF No. 13), and **GRANTING** Defendant's motion, (ECF No. 17), and affirming the decision.

### III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file

specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: April 21, 2021                                   S/ PATRICIA T. MORRIS
                                                      Patricia T. Morris
                                                      United States Magistrate Judge